J-S19035-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: K.S., JR., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.S., SR., FATHER | |
| | No. 366 MDA 2023 |

Appeal from the Decree Entered February 23, 2023
In the Court of Common Pleas of Lycoming County
Orphans' Court at No(s): 2022-6820

| | |
|---|---|
| IN RE: L.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.S., SR., FATHER | |
| | No. 367 MDA 2023 |

Appeal from the Decree Entered February 23, 2023
In the Court of Common Pleas of Lycoming County
Orphans' Court at No(s): 2022-6821

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED: SEPTEMBER 6, 2023**

K.S., Sr. ("Father") appeals from the decrees granting the petitions to involuntarily terminate his parental rights to his children, K.S., Jr. ("K.S.") and L.S. ("L.S."), a son and a daughter both born in February 2019.[1] After careful

_____

[1] By separate decrees on the same date, the Orphans' Court involuntarily terminated the parental rights of C.M. ("Mother"). Mother did not appeal, and she is not a party to Father's appeals. This Court consolidated Father's appeals.

review, we affirm in part, vacate in part, and remand for further proceedings consistent with this memorandum.

As summarized by the Orphans' Court the relevant facts and procedural history are as follows:

The [Lycoming County Children and Youth Services ("the Agency")] first became involved with the family in April of 2021, when [K.S. and L.S. ("the children")] were seen playing alone on the playground after getting out of the home. On April 20, 2021, the children were later seen playing near and hanging out of an open 2nd story window, and were found home alone when Agency workers responded. At that time there was a bathtub in the home that was overflowing with water.[2] Mother claimed that Father was supposed to be in charge of the children at the time. . . . Father testified that Mother asked him to drive her to the store and he assumed Mother's friend was in the home and would be responsible for the children. Father also testified, in an apparently conflicting manner, that he was contacted about this incident and when he arrived at the scene Mother asked him to lie and say he was there the entire time but stepped out to take the trash outside. A safety plan was implemented on June 2, 2021, wherein the paternal grandmother was to stay in the home and Mother was not to have unsupervised contact with the children. On July 1, 2021, Mother violated the safety plan by taking the children to Cumberland County without permission and without a supervisor named on the safety plan. On that date, the Agency was verbally granted emergency custody of the children.

A Shelter Care hearing was held on July 2, 2021. Both parents attended. Following the hearing, the [c]ourt found that sufficient evidence was present to prove that return of the [children] to the home of the parents was not in the best interest of the [children]. Legal and physical custody of the [children]

_____

[2] The children were then two years old.

remained with the Agency and placement of the [children] remained in Foster Care.[3]

A Dependency hearing was held on July 21, 2021, after which the [c]ourt adjudicated the [children] dependent. As the [c]ourt found that allowing the [children] to be returned to either parent's home would be contrary to the [children]'s welfare, legal and physical custody w[ere] ordered to remain with the Agency. The [c]ourt noted that both parents should work with their Outreach worker and caseworker, and comply with the Family Service Plan. The parents were specifically ordered to follow through with any services or counseling offered with regard to their relationship as there was a history of domestic violence.[4]

A permanency review was held on December 8, 2021.[5] The [c]ourt noted that there had been minimal compliance with the permanency plan on the part of Mother, in that she and Father were in an on again/off again relationship but she was not receiving domestic violence treatment. . . . Father was incarcerated for the majority of this review period and the [c]ourt found him to have no compliance with the permanency plan. Father had made no progress toward alleviating the circumstances which necessitated placement as he was not participating in domestic violence counseling. Father was released from incarceration on November 10, 2021, and had made no effort to resume visits with the children at the time of the permanency review. His attendance rate prior to his incarceration was approximately 50%. In its [o]rder, the [c]ourt strongly emphasized the need for each parent to participate in counseling or other program to address the domestic violence that was prevalent in their relationship. Following the hearing, the [c]ourt reaffirmed dependency and the [children] remained in the legal

_____

[3] The court wrote separate, virtually identical opinions concerning K.S. and L.S. We cite to the court's opinions in the singular and refer to the children collectively.

[4] Mother sought a Protection from Abuse order against Father in August 2019 but it was dismissed when she failed to pursue it. **See** N.T., 2/8/23, at 48.

[5] The court appointed the children's dependency Guardian *ad litem* as the children's termination of parental rights counsel and found no conflict in the dual representation. **See** Orders, 10/26/22.

and physical custody of the Agency with continued placement in the foster care home.

On March 21, 2022, the [c]ourt granted the Agency's Motion to Modify the [Children's] Placement, as the [foster] parents relocated and were no longer able to be a resource for the [children]. A permanency review hearing was held on March 25, 2022. The [c]ourt found that there had been moderate compliance with the permanency plan by both Mother and Father. . . . Father was residing with his sister and unemployed at the time of the review. Father was consistently late for his visits but did attend most of his visits and they reportedly went well. . . . [F]ather was found to have made moderate progress toward[] alleviating the circumstances which necessitated the original placement. Following the hearing, the [c]ourt reaffirmed dependency and legal and physical custody of the [children] remained with the Agency for continued placement in the current foster home.

A permanency review was held on July 20, 2022. . . . Father was found to have minimal compliance with the permanency plan in that he continued to reside with his sister instead of obtaining independent housing and he changed jobs several times. Father was not meeting with Outreach Services and only attended 45% of his visits. Father chose not to engage in domestic violence counseling because he and Mother were no longer in a relationship. The [c]ourt found that both Mother and Father had made minimal progress toward alleviating the circumstances which necessitated the original placement. The [c]ourt noted [its] concern with the progress made by Mother and Father in obtaining and maintaining suitable housing, and emphasized the need for both Mother and Father to act with urgency to obtain and maintain suitable housing and employment to be able to support the needs of the children, as the children had been in placement for over a year. Both parents requested community visits which the [c]ourt directed the [A]gency to arrange if that parent attended at least 90% of his or her visits over the following four weeks. Following the hearing, the [c]ourt reaffirmed dependency and legal and physical custody of the [children] remained with the Agency for continued placement in the current foster home. On August 5, 2022, the [c]ourt granted the Agency's Motion to Modify the

[Children's] Placement, as the current resource parents were no longer able to be a resource for the [children].[6]

A permanency review hearing was held on October 14, 2022. . . . Father had no compliance with the permanency plan, in that he was not employed and did not have independent housing. Father did not participate in any Outreach Services or any type of counseling or domestic violence treatment. Father attended only 63% of his visits during the review period, and was frequently late when he did attend. Neither parent met the 90% attendance goal necessary to progress to community visits. The [c]ourt found that Mother and Father made no progress toward alleviating the circumstances which necessitated the original placement. . . . Following the hearing, the [c]ourt reaffirmed dependency and legal and physical custody of the [children] remained with the Agency for continued placement in the current foster home. The [c]ourt approved another Petition for Modification of the [Children's] Placement on October 14, 2022, which resulted in the fourth resource home[7] since the [children were] placed in the legal and physical custody of the Agency.

Orphans' Court Opinion, 2/23/23, at 1-6.

The court conducted a hearing on the Agency's involuntary termination petitions in February 2023. Father's outreach caseworker, Cory Burkholder, testified that after Father's incarceration from August to November 2021, Father did not resume visits to the children until the court ordered him to do so in December 2021. *See* N.T., 2/8/23, at 11-13; *see also id*. at 30-32. Burkholder further testified that Father's compliance with visitation and

---

[6] The Agency filed petitions seeking involuntary termination of Father's and Mother's parental rights based on 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). *See* Petition, 9/9/22.

[7] The court used the terms "foster home" and "resource home" interchangeably.

participation with parenting "tailed off" after he and Mother became estranged, when the children were in placement. *See id*. at 12-13. Father could not maintain consistent employment, had several jobs for short time periods, and lived primarily with his sister. *See id*. at 13-15.[8] Father did complete the parenting program included in his goals. *See id*. at 17.

Agency visitation caseworker Heather Goodbrod ("Goodbrod") testified that in April 2022 Father was placed on "call-in status" when he failed to appear or call to cancel three scheduled visits. Because Father failed to achieve the court's 90% visitation goal, he did not progress to community visits with the children and his twice-weekly, one-hour visits remained closely observed or supervised at the time of the hearing. *See id*. at 19, 26-27, 30, 32, 36. Goodbrod testified that Father was loving with the children but frequently late for visits and did not always change the children's diapers without being prompted to do so, once declaring, "My visit is over. I don't need to do that." *See id*. at 34, 39-40. Goodbrod testified that in his visits in the six months before the February 2023 hearing, Father sat on the sofa and allowed the children to play around him without interacting. *See id*. at 34-35, 37-38. On another occasion, he declined L.S.'s request to be picked up and told her, "You'll get me sick." *See id*. at 35, 42. Goodbrod had to pick L.S. up because

---

[8] Father obtained an apartment in late December 2022 or early January 2023. *See* N.T. 2/8/23, at 16.

the child was crying so heavily to the point she seemed about to make herself sick. *See id*.

Pompey Suggs ("Suggs"), a caseworker with the Agency, testified that Father had six indicated reports of child abuse, including a report of indecent sexual assault of a child. *See id*. at 44-45, 75-78, 84. Suggs testified the Agency was concerned about Mother's and Father's use of physical discipline on the children and domestic violence counseling was added to the family service plan. *See id*. at 50, 91-92. Suggs testified that the court directed Father and Mother to get counseling to address domestic violence concerns, but Father was discharged after he attended only two sessions that were provided to him at no cost. *See id*. at 59-60, 64-65, 92, 100, 114-17. Suggs testified that Father said he did not need counseling because he was not going to reconcile with Mother. *See id*. at 64, 77-78. Suggs testified that Father did not send the children any letters or birthday or Christmas presents. *See id*. at 78, 90. Suggs testified that Father did not make himself available for a bonding assessment and did not set up a time for the assessment even after Suggs provided him the information. Although Father testified he did not receive mail or otherwise know about the assessment, he had received, and replied to, other mail from Suggs. *See id*. at 79-81, 91, 93, 128-29.

The resource mother, with whom the children had been living since October 2022, testified that she and her husband took care of all the children's physical and emotional needs, the children were very fond of her ten-year-old

daughter, were integrated into Halloween, Thanksgiving, and Christmas family activities, and experienced an emotional toll from visits with Father. *See id*. at 54-58. She also testified she and her husband love the children very much and were prepared to adopt them if the court terminated Father's and Mother's parental rights. *See id*.

Father testified that he had lied on Mother's behalf and assumed responsibility for the April 2021 incident, his mother's death in March 2022 delayed his ability to reclaim his children and impaired his ability to engage in domestic violence counseling seven month later, and L.S. looked malnourished for months while with the foster family. *See id*. at 94-103, 106-114, 125-28, 137. Father claimed that the court previously supported his attempts to concentrate on grief counseling for his mother's death rather than domestic violence counseling. *See id*. at 115-16. He claimed he later tried to find domestic violence counseling but could not. *See id*. at 117-18. He testified that he was not sure why it took thirteen months from his release from prison to get his own residence. *See id*. at 122-23. He also testified that he had a new job as of October 2022 and a new apartment, although he had no plans for daycare if reunified with the children. *See id*. Father was not sure why he attended only two of the children's medical and dental visits. *See id*. at 104-05.

By Opinions and Decrees dated February 22, 2023, the court terminated Father's parental rights to K.S. and L.S. Father timely appealed and complied

with Pa.R.A.P. 1925(a)(2)(i) and (b). The Orphans' Court thereafter incorporated its prior opinions and orders as its Rule 1925(a) opinion.

On appeal, Father presents the following issues for our review:

1. The court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[A.] § 2511(a)(1) when [Father] has not failed to perform parental duties of a period of at least six months and made every effort to have a relationship with his child.

2. The court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[A.] § 2511(a)(2) when there was insufficient evidence that the child was without essential parental care, control or subsistence necessary and causes of the incapacity cannot or will not be remedied as [Father] made substantial progress to remedy the incapacity and provide the child with essential parent[al] care, control and subsistence necessary.

3. The court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[A.] § 2511(a)(5) in finding that (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal or placement of the child continue[] to exist; (3) and termination would best serve the needs and welfare of the child when [Father] has remedied the conditions and the needs and welfare of the child would not be best served by termination.

4. The court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[A.] § 2511(a)(8) in finding that [(1)] the child has been removed from parental care for twelve months or more from the date of removal; (2) the conditions which led to removal or placement of the child continue[] to exist and termination would best serve the needs and welfare of the child when [Father] has remedied the conditions and the needs and welfare of the child would not be best served by termination.

5. The court erred in terminating the parental rights of [Father] pursuant to 23 Pa.C.S.[A.] § 2511(b), when there is a healthy bond between the child and [Father] which would be traumatic

- 9 -

> if broken and the best interests of the child would not be served by termination.

*See* Father's Brief at 7-8.

Father's issues implicate the involuntary termination of parental rights. Pennsylvania's Adoption Act ("the Act") governs involuntary termination of parental rights proceedings. *See* 23 Pa.C.S.A. §§ 2101-2938. We review involuntary termination orders for an abuse of discretion, which requires an error of law or a showing of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (citation omitted). In applying this standard, an appellate court must accept the trial court's findings of fact and credibility determinations if supported by the record. *See Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021); *see also In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). This standard "reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings." *In re Adoption of S.P.*, 47 A.3d 817, 830 (Pa. 2012).

In considering a petition to terminate parental rights, a court must balance the parent's fundamental right "to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *See C.M.*, 255 A.3d at 358. Termination of parental rights can have "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. Pennsylvania law requires the moving party to establish the statutory grounds

by clear and convincing evidence, evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022). We remain mindful that "a parent's basic constitutional right to the custody and rearing of [his] child is converted, upon the failure to fulfill [his] parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Here, the Orphans' Court terminated Father's parental rights to the children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). To affirm the decree, we need only agree with the court's decision as to any one section of 2511(a), along with subsection (b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we analyze the court's termination decree pursuant to section 2511(a)(8) and (b), which provide as follows:

> **(a)** **General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * * *

- 11 -

> **(b)** **Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6), or (8),  the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

To satisfy section 2511(a)(8), the petitioner must establish three elements: (1) the child has been removed from the care of the parent for at least 12 months; (2) the conditions which led to the removal or placement of the child still exist; and (3) termination of parental rights would best serve the needs and welfare of the child.  ***See In re Adoption of J.N.M.***, 177 A.3d 937, 943 (Pa. Super. 2018).  This section focuses on the conduct of the parent.  ***See In re C.L.G.***, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*).  Although we have recognized that the application of Section 2511(a)(8) may seem harsh when a parent has begun efforts to resolve the problems that had led to the removal of a child, we are cognizant that the statute implicitly recognizes "that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006); ***see also id***. at 511-12 (holding

that a parent's argument that there was a reasonable probability she could remedy the conditions that led to a child's removal from her care is irrelevant under subsection (a)(8)).

Father asserts with respect to subsection (a)(8)[9] that the dispute in this case centers on whether the conditions which led to removal or placement still exist and cannot or will not be remedied by Father. He asserts that he has remedied those conditions and substantially completed his goals, and his domestic violence counseling is moot. Without offering any argument, he asserts that termination would not serve the needs and welfare of the children.

The Orphans' Court concluded that sufficient evidence established subsection (a)(8) because the children have been in the legal and physical custody of the Agency since July 2021, Father had moderate compliance in one review period and minimal or no compliance in the other three, Father struggled to maintain consistent employment, Father was unable to articulate specific reasons for his delay in achieving his reunification goals, and Father failed to address his domestic violence issues, "which was a primary factor leading to the removal of the [children] from the home and placement in foster care." **See** Orphans' Court Opinion, 2/23/23, at 16. In finding that termination best served the needs of the children, the court noted that Father took fifteen

_____

[9] Father and the Orphans' Court combine their analyses of subsections (a)(5) and (a)(8). **See** Father's Brief at 25-28; Orphans' Court Opinion, 2/23/23, at 14-17.

months to obtain steady employment and almost eighteen months to obtain independent housing while leaving the care of children's physical and emotional needs to be met by multiple foster families. **See** Orphans' Court Opinion, 2/23/23, at 16-17.[10] The court also highlighted the willingness of the current foster family, with whom the children had lived for four months, to give the children permanency. **See id**.

We discern no error of law or abuse of discretion in the Orphans' Court's determination. At the time the Agency filed the termination petition in September 2022, the children had been removed from the parents' care, at least twelve months had elapsed, the conditions that led to placement (Father's housing, employment, and domestic violence concerns) continued to exist, and Father, based on his conduct, did not demonstrate a present ability to meet the children's needs and welfare, thereby demonstrating that termination would best serve the children's needs and welfare. **See J.N.M.**, 177 A.3d at 943.[11]

Father's second issue implicates the best interest of the children. Section 2511(b) requires a separate consideration of whether termination will meet the

---

[10] The court's proper focus was on Father's and Mother's **pre-petition** conduct. **See** 23 Pa.C.S.A. § 2511(b) (stating that in assessing a petition filed under subsection (a)(8), the court shall not consider a parent's remedial measures initiated after receipt of notice of the filing of the petition).

[11] Father improperly relies on his post-petition conduct when asserting that he demonstrated conditions supporting reunification. **See** n.9.

child's needs and welfare.  *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).  The Supreme Court has recently re-emphasized that pursuant to section 2511(b) courts "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. . ..  This of course requires the court to focus on the child and consider all three categories of need and welfare."  *Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023).  *K.T.* specifically directs courts to "consider the matter *from the child's perspective*, placing her developmental, physical, and emotional welfare *above concerns for the parent*."  *Id*. (citation omitted; emphasis in original).  The child's emotional needs and welfare include intangibles, such as love, comfort, security, and stability.  *See T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).[12]

When it considers the parental bond, the court must examine whether termination of parental rights "will destroy a necessary and beneficial relationship, thereby causing a child to suffer extreme emotional consequences".  *K.T.*, 296 A.3d at 1110 (quotation marks and citation omitted).  That focus enables a court to properly prioritize the child's needs:

---

[12] Courts considering an involuntary termination petition "must keep the ticking clock of childhood ever in mind.  Children are young for a scant number of years, and we have an obligation to see to their healthy development *quickly*."  *K.T.*, 296 A.3d at 1108 (citation omitted; emphasis in original) (also noting that *T.S.M.* advised courts to move toward an alternative permanent home when it is clear the parent will be unable to provide for the child's basic needs in the near future, so as not to impair the bond with pre-adoptive parents).

> [B]y evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain.

*Id*. The subsection (b) inquiry must consider not only the parental bond, if any, but also the child's need for permanency, the length of time in foster care, whether the child is in a foster home and bonded with foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible ones. *See K.T.*, 296 A.3d at 1106.

With respect to section 2511(b), Father argues that he has a bond with children and the breaking of that bond would be traumatic, he did not intentionally fail to comply with the bonding assessment, and the children have not been with current foster family long enough to have developed a parental bond with them.

The court rejected Father's claim because Father had a poor attendance rate of visits with the children, and the court found termination of parental rights would not cause irreparable harm to the children because the children had "clearly bonded with the resource parents." *See* Orphans' Court Opinion, 2/23/23, at 18-19.

Following our review, we conclude that the Orphans' Court abused its discretion when rendering its involuntary termination decision without properly considering the 2511(b) factors which the Supreme Court highlighted in *K.T.* At the outset, the record fails to disclose any meaningful testimony concerning

the nature of the bond between the children and Father or the effects of termination on the children. The Agency's witnesses described Father's declining interest in the children during visits in the six months before the hearing but did not elicit any evidence concerning the child-parent bond, beyond some sense of the children's engagement during visits with Father and the emotions, or lack therefore, at the end of those visits. We note that at least some testimony suggested that the children continued to seek Father's attention and care and were upset when he did not respond. **See** N.T., 2/23/23, at 35, 41. As **K.T.** explains, a child's developmental and mental and emotional health are the critical subjects of inquiry rather than their feelings or affection for a parent. **See K.T.**, 296 A.3d at 1110 (noting that even abused and neglected children may retain feelings or affection for the parent). **K.T.** requires a fuller exploration of the nature of the bond, if any, between the children and Father than occurred here.

Additionally, the court did not have enough information concerning the nature of the children's relationship with the current "resource" mother to comply with **K.T.**'s direction to consider the matter from the **child's perspective**, placing their developmental, physical, and emotion welfare above concerns for the parent. **See K.T.**, 296 A.3d at 1105. The court heard no testimony from a social worker or anyone else about whether the children had a bond with resource parents. Instead, the court heard only resource mother's testimony about her deep affection for the children, that she had

incorporated the children into her family and family activities, the children and their resource sibling had a close connection, and she attended to the children's daily dietary, emotional, and medical needs. We further note that she testified the children were suffering an emotional toll from visits and she received reports of "behavior" following those visits from the children's preschool. *See* N.T., 2/23/23, at 57. However, resource mother only had the children for four months before the hearing, none of the Agency's witnesses testified that the children had bonded with the resource family to such a degree that termination of Father's parental rights would have no detrimental effect on the children's development, emotional, and physical needs, and the court heard nothing from the children themselves. *K.T.* requires the court to focus on the *child's* perspective, not adults', *see K.T.*, 296 A.3d at 1105. The trial court therefore could not give proper weight to the children's perspective with the evidence before it.

We note that the Agency made a referral for a bonding evaluation. *See* N.T., 2/8/23, at 80. The record is not entirely clear why the evaluation did not occur. There is some evidence to suggest that Father knew about the evaluation but declined to cooperate, *see id*. at 80-81, 91-93, but the Orphans' Court declined to make a specific finding about Father's knowledge. *See* Orphans' Court Opinion, 2/23/23, at 18. There was some evidence that a more formal bonding evaluation would have assisted the court. Given the lack of analysis of the factors that *K.T.* states are critical and the enormous

consequences of involuntary termination on Father and the children, it is appropriate to remand this case for the court to conduct a more detailed inquiry into the best interests of the children, at which the Agency may provide additional evidence concerning the children's needs and any bond they have with Father and/or resource parents. *See R.J.S.*, 901 A.2d at 516 (holding that remand is proper where the evidence of record is insufficient to permit an assessment of the emotional bonds between parent and children). We thus affirm the Orphans' Court's finding as to subsection (a)(8), vacate its decision as to subsection (b), and remand for further proceedings consistent with this decision.

Case remanded for proceedings consistent with this decision. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/6/2023